# Exhibit A



# Loan Application

February 1,    2022

Chirs Robinson

114 Channel Rd.

Eastsound, WA 98245

Re:    Heron Apartments ("Property")

Dear Mr. Robison:

Crescit Mortgage Capital, LLC, or its successors and or assigns ("CMC") is pleased to submit the following general mortgage loan proposal for the Property.  This letter shall serve as an exclusive financing application (the "Application") to CMC from you (the "Applicant" or "Borrower") to provide a first mortgage Lien to finance the Property and Project.  Approval of the mortgage loan (the "Loan") will be subject to credit committee approval ("Credit Committee Approval").  If approved, the Loan will be made in accordance with and subject to the requirements, terms and conditions of the Credit Committee and any other requirements or conditions provided hereunder.

| | |
|---|---|
| Loan Purpose/Business Plan: | Proceeds of the Loan shall be used solely for the following purposes:<br>(a)   the refinance of the Property<br>(b)   fund interest and operating shortfalls<br>The activities relating to the Business Plan shall be collectively, referred to herein as the "Project". |
| Property: | The Property is comprised of:<br>1.  82 units multifamily apartment building located at 1624 E. 32nd Street, Tacoma, WA.<br>2.  Fee simple interest |
| Sponsor: | Chris Robison & Emerald Bay Apartments, LLC |
| Guarantor: | Chris Robinson, Kim Draeger, Chuck Walle    jointly and severally. |
| Borrower: | Each of Borrower and the direct owner of Borrower will be required to be a "special purpose entity" with limited purpose and separateness covenants, in the form specified by the Lender, to be contained in the organizational |

{1436754.1 }

| | |
|---|---|
| | documents of the borrowing entity and in the Loan Documents, formed solely for the purposes of owning, developing, operating and financing the Property. |
| Lender | Crescit Mortgage Capital LLC or its affiliate, designee, or assignee. |
| Security for Loan: | The Loan shall be secured by, among other things, (i) first mortgage lien on and perfected first security interest in the Property (including any inclusionary air rights purchased), all leases, improvements, reserves, escrows, rents, income, deposits and profits therefrom, and all personal property not owned by tenants (including replacements, substitutions and after-acquired property) located thereon or used or intended to be used in connection therewith or for which proceeds of the loan are advanced, (ii) an assignment of all cash flows received by or on behalf of Borrower, (iii) an assignment of all permits, contracts and agreements (including development, construction, management, rental and other operating agreements, ground leases and licenses) pertaining to the Property, (iv) an assignment of all trademarks, trade names, websites, and URL addresses, (v) a first priority pledge equal to 100% of the direct and indirect ownership interests in Borrower. |
| Loan Amount: | $14,000,000, including a $1,350,000 Earnout Reserve, or $12,650,000 (the "Net Loan Amount")    as further described in Exhibit C – Sources & Uses. |
| | [Intentionally left blank] |
| Loan Term: | 36 months. |
| Extension Options: | Two, twelve (12) month extension options will be granted provided Lender's standard conditions are met, including but not limited to the following: (i) no event of default currently exists or has occurred beyond applicable grace and cure periods; (ii) payment of a 1.0% Extension Fee based upon the Loan Amount for the first extension and 1.0% Extension Fee based upon the Loan Amount  for the second extension; (iii) balancing of all necessary reserve accounts as determined by Lender; (iv) minimum 7.5    % debt yield and a 1.38     x DSCR for the first extension and 7.75 % debt yield and a 1.40             x DSCR for second extension; and (v) maximum As-Is LTV of 65    % for each extension. |
| Amortization: | Interest only |
| Interest Rate: | 5.35    % (the "Rate") fixed for 36 months. This is the rate as of January 25, 2022. The final interest rate will be established at the time of closing and will be equal to the greater of 5.         % or one-month LIBOR+5.15 0 basis points. The Loan will accrue on an Actual/360 basis. |
| | [Intentionally left blank] |
| Loan Origination Fee: | 1.00% of the Loan Amount. |
| Exit Fee: | 1.00% of the Loan Amount, 33% waived if Crescit provides the refinance. |

| | |
|---|---|
| As-Is Loan-to-Value: | At closing, the ratio of the Loan Amount to the fair market as-is value of the Property, as determined by the appraisal obtained by the Lender may not exceed 70 % of the as-is appraised value. |
| Stabilized Loan-to-Value: | At closing, the ratio of the Loan Amount to the "as stabilized" fair market value of the Property, as determined by the appraisal obtained by the Lender may not exceed 66 % of the as stabilized market value. |
| Stabilized Debt Yield: | At closing, the ratio of underwritten stabilized net cash flow and the Net Loan Amount shall not be less than 7.0%. |
| Stabilized DSCR: | The Stabilized DSCR shall be calculated by dividing the underwritten stabilized net cash flow by the debt service due based on the Net Loan Amount at the actual interest rate on the Loan. At closing, the DSCR on the loan shall not be less than 1.35 x. |
| Prepayment: | Prepayment of the Loan shall be permitted at any time subject to 18 make-whole interest.<br><br>[Intentionally left blank] |
| Recourse: | Borrower and Guarantor shall have limited personal liability for the repayment of the Loan. Borrower and Guarantors shall be jointly and severally personally liable for (a) obligations under a carry/debt service guaranty (which includes property operating expenses, insurance, taxes, and debt service), (b) any required repairs or maintenance to be completed during the Term, and (c) all loss, cost or damage suffered by Lender due to certain amounts resulting from or arising in connection with those Retained Liability Matters as will be more fully described in the final Loan Documents. Retained Liability Matters shall be liability for the following:<br><br>A. Recourse for Damages<br><br>(i) the misapplication or misappropriation of income, rents, tenant security deposits, deposits, insurance proceeds, condemnation awards or other funds;<br><br>(ii) all loss, cost or damage incurred by Lender relating to hazardous materials and hazardous substances including breach of any representation, warranty, covenant or indemnification in any of the Loan Documents concerning environmental laws and hazardous |

substances;

(iii) proven fraud, material misrepresentation, gross negligence, willful misconduct, and/or failure to disclose a material fact by Borrower or Guarantor or any affiliate thereof;

(iv) physical damage to the Property caused by gross negligence or willful misconduct of Borrower or Guarantor or any affiliate thereof;

(v) breach of warranty by Borrower that the lien of the mortgage or any other loan document shall not be deemed a fraudulent conveyance or preference;

(vi) enforcement and foreclosure costs and expenses and other expenses provided for in the Loan Documents;

(vii) failure to pay charges for real estate taxes, labor or materials or other charges or judgments that can create liens on any portion of the Property;

(viii) failure of Borrower to obtain and maintain fully paid for insurance policies.

(ix) intentional physical waste of the Property;

(x) the wrongful removal of personal property; and

(xi) failure to obtain and maintain the interest protection agreement.

(xii) Violation of the single-purpose entity provisions contained in the Loan Documents; however, if such violation is cited as a material factor in the order for a substantive consolidation of the Borrower (or its assets) with any other Person (or its assets) in any proceeding under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, then the loan will become full recourse.

B. Springing Full Recourse

(i) a transfer or encumbrance/lien of the Property or transfer of any interest therein in violation of the Loan Documents;

(ii) the Borrower or Manager commences a voluntary bankruptcy or insolvency proceeding (including other typical bankruptcy-related causes);

(iii) the filing of an involuntary bankruptcy petition against Borrower or Manager by any person in which (x) Borrower or any person that directly or indirectly controls Borrower or its direct owner colludes with or otherwise assists such person, and/or (y) Borrower or any person that directly or indirectly controls Borrower solicits or causes to be solicited petitioning creditors for any involuntary

       petition against Borrower or Manager by any person;

(iv) Borrower or any person that directly or indirectly controls Borrower files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition against it by any other person;

(v) Borrower or any person that directly or indirectly controls Borrower consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, liquidator, trustee or examiner for Borrower or any portion of the Property;

(vi) Borrower or its direct owner makes an assignment for the benefit of creditors;

(vii) any litigation or other proceeding filed by Borrower, Guarantor or any affiliate thereof which is intended primarily to delay or interfere with the exercise of Lender's default remedies provided in the Loan Documents; or

(viii) Borrower, by a court of law, is substantively consolidated with any other person.

       Borrower and Guarantor's liability for the Retained Liability Matters set forth above shall survive the foreclosure (or the acquisition of the security property by Lender, its successors and assigns, by a deed in lieu thereof or otherwise) of any instrument given to secure the Note.

       The Guarantors will sign one or more agreements unconditionally guaranteeing the Borrower's payment and performance of all the Retained Liability Matters contained in the Note and other Loan Documents and indemnifying Lender for any and all losses or damages which Lender may incur in connection with the Retained Liability Matters and as a result of the presence of any hazardous substances on the Property or the violation of any environmental laws. The dissolution, liquidation or the cessation of the legal existence of any Guarantor that is not a natural person or the death of any Guarantor who is a natural person shall be a default under the Loan Documents, unless, following any such event, any remaining Guarantor or Guarantors have an aggregate net worth at least equal to the Guarantor Net Worth Requirement (as defined below), or unless within ninety (90) days of such an event, a replacement Guarantor (subject to the approval of Lender in its sole discretion)assumes the obligations of the subject Guarantor, so that the Guarantors collectively meet the Guarantor Net Worth Requirement.

       Guarantor on-going net worth and liquidity covenant: The Guarantors' aggregate net worth shall equal or exceed $15,000,000 and liquidity shall equal or exceed $1,500,000.

| Initial Advance: | As a condition to the first advance of Loan proceeds (the "Initial Funding"), among other conditions, (a) all applicable regulatory approvals, licenses, permits and authorizations necessary for the Project have been |

obtained, (b) no default shall have occurred under the Loan Documents, (c) the Property shall have obtained the final certificate of occupancy and all units are legally allowed to be leased and occupied, (d) conditions as set forth in Exhibit B and (e) all other conditions to the Initial Advance required by Lender as set forth in the Loan Documents shall be satisfied.

**Upfront Lender Reserves:** Lender will establish escrow accounts for approved costs for the initial term of the Loan as determined prior to closing, subject to Lender's discretion based on Lender's property condition report or other Property needs as reasonably determined in due diligence by Lender. Lender shall fund approved costs out of such reserves as described herein and further detailed in the Loan Documents. Funds shall be disbursed to Borrower in accordance with the provisions set forth in the Loan Documents.

Interest and Operating Reserve: Lender will establish an interest and operating reserve of approximately $[    such amount to be determined in underwriting, Borrower has requested $380,000]    (the "Interest and Operating Reserve") for the initial term of the Loan which will be funded at closing from initial loan proceeds. The specific Interest Reserve amount will be determined prior to closing, subject to underwriting and due diligence. If at any time during the initial term of the Loan, the balance in the Interest and Operating Reserve falls below $    [to be determined in underwriting]    , Borrower will be required to replenish the reserve in the amount needed to achieve 1.0x DSCR based on underwritten net cash flow ("NCF") for a 12-month period (NCF utilized for this calculation will be based on trailing 6-month NCF annualized. Lender shall fund debt service and operating expense shortfalls as needed out of such reserve on a monthly basis as described herein and further detailed in the Loan Documents. At such time that the Lender's underwritten net cash flow on a trailing 12-month basis results in a minimum debt yield of 7% and minimum DSCR of 1.30x, amounts in the Interest and Operating Reserve will be released to the Borrower.

Lender will establish a reserve in the amount of $1,350,000 at closing (the Earnout Reserve") which may be released in whole based on the Property attaining a minimum of a 7.2    % debt yield and an actual DSCR of 1.35    x based on underwritten net cashflow utilizing the trailing 12 month income and expense statement.

**On-going Reserves:** Lender will require a monthly and initial escrow for Real Estate Taxes, Insurance, operating expenses and other charges; such amount to be determined in Lender's sole discretion. Funds shall be disbursed in accordance with the provisions set forth in the Loan Documents.

Capital Expenditures/Replacement Reserve: Commencing upon the closing of the Loan, Lender will require a monthly reserve equal to $300 per unit

per year, which amounts may be adjusted after receipt and review of a third-party property condition report conducted on behalf of the Lender. Funds shall be disbursed to Borrower in accordance with the provisions set forth in the Loan Documents.

Additionally, Borrower will be required to deposit with Lender any lease security deposits, and termination payments paid to Borrower in consideration of any termination of any lease during the term of the Loan. Such amounts shall be disbursed to Borrower in accordance with the provisions set forth in the Loan Documents.

[Intentionally left blank]

| | |
|---|---|
| Cash Management: | At closing, Borrower shall establish a clearing account ("Clearing Account") at a bank acceptable to Lender. Borrower (or Borrower shall direct Manager) shall deposit all property receipts (and any other payments) directly into the Clearing Account. All funds in the Clearing Account shall be swept daily into a Cash Management Account controlled by Lender. All funds in the Cash Management Account shall be applied by Lender to payments of taxes, insurance, debt service, capital and required reserves. Lender shall remit to Borrower on a monthly basis funds equal to one twelfth of the annual operating expenses as determined in accordance with an annual operating budget that shall be prepared by Borrower and approved by Lender. All remaining cash flow in the Cash Management Account shall be held and maintained by Lender in a reserve (the "Excess Cash Reserve") as additional collateral for the Loan for the balance of the term of the Loan or until such time that the Lender's underwritten net cash flow on a trailing 12-month basis results in a minimum debt yield of 7.0% and minimum DSCR of 1.30x, at which time the balance of the Excess Cash Reserve and amounts remaining in the Interest and Operating Reserves will be released to the Borrower and the sweep of funds from the Clearing Account to the Cash Management Account will cease. If at any point the Lender's NCF on a trailing 12-month annualized basis results in a minimum debt yield of less than 7% and a DSCR of less than 1.30x, or (a) an event of default, or (b) the insolvency of Borrower or the Property Manager (a "Lockbox Event"), all amounts in the Clearing Account will be swept into the Cash Management Account on a daily basis and all Excess Cash Reserves shall be held as additional collateral for the loan. |
| Property Management: | The Property shall be managed by Greystar or other reputable third-party management firm approved by Lender in its sole discretion, pursuant to a Lender-approved, arms-length, property management agreement, which shall be subordinate to the Loan and terminable by Lender without the obligation to pay any fee or penalty upon the occurrence of such manager's bankruptcy, gross negligence, malfeasance or willful |

|  |  |
|---|---|
|  | misconduct, commingling, or misappropriation of funds, failure to pay mechanic after Owner has paid manager that bill, fraud or an event of default (the "Manager", or "Property Manager"). |
| Borrower Distributions: | Borrower shall not be permitted to make any dividend or other distributions of cash or any other assets to its direct or indirect members, partners or shareholders, until the outstanding principal balance of the Loan and all accrued and unpaid interest thereon together with any other amounts due under the Loan Documents shall be repaid in full. |
| Insurance: | The Borrower shall provide evidence of insurance in form and substance acceptable to Lender, evidencing coverage as required pursuant to the Loan Documents. The Borrower shall provide an Acord 28 (real property), Acord 27 (personal property) or Acord 25 (liability) certificate, or another document satisfactory to the Lender conferring on the Lender the rights and privileges of mortgagee. The Borrower must also provide Lender with a paid insurance agent's receipt for all current coverages. All insurance policies required hereunder shall be carried by companies rated "A" by S&P and shall not contain exclusions for terrorism coverage or mold coverage. All certificates of insurance must name the Borrower as the insured, or as an additional insured, must include the complete and accurate property address and must bear the original signature of the issuing insurance agent. The Lender must be named as "first mortgagee" under a standard mortgage clause on all property insurance policies and coverages and as an "additional insured" on all liability policies and coverages. The Lender must be identified and its successors and assigns, as their interests may appear. All insurance policies must require the insurance carrier to give the Lender a minimum of ten (10) days' notice in the event of modification, cancellation, or termination for non-payment of premium and a minimum of thirty (30) days' notice of non-renewal. |
| No Further Encumbrance or Indebtedness: | No secondary financing or encumbrance or secured or unsecured indebtedness of any kind other than the Loan shall be permitted with the exception of trade payables (not more than 60 days outstanding) incurred in the ordinary course of business in an amount not to exceed 1% of the initial principal balance of the Loan. No direct or indirect interest in or right to distributions from Borrower may be pledged or encumbered as collateral for any obligation other than the Loan. |
| Transfers: | Transfers of any direct or indirect interest in the Property and/or any ownership interest in the Borrower will not be permitted without Lender's prior express written approval, which approval may be given or withheld in Lender's sole and absolute discretion. |
| Loan Documents: | In the event of any inconsistencies between the terms hereof and the terms of the Loan Documents, the terms of the Loan Documents shall control. Loan Documents shall include all documents and instruments, together with any and all renewals, amendments, extension and other modifications |

| | |
|---|---|
| | thereof, necessary to find and close the loan are collectively referred to herein as the "Loan Documents". |
| Cooperation: | At Lender's cost, Lender may at any time, without the consent of Borrower, Guarantor or Sponsor, securitize, participate, sell, assign or syndicate all or any portion of the Loan, cause the Loan to be split into senior and one or more mezzanine loans and to create one or more senior and subordinate notes (i.e., an A/B structure) and Borrower shall execute all documents required by Lender to effectuate such split. |
| Third Party Reports: | This Loan Application is expressly subject to receipt of the following third-party reports (including the reliance language contained therein) from parties acceptable to Lender and in form and substance acceptable to Lender: (i) engineering reports, (ii) Phase I environmental reports (and Phase II if recommended), (iii) a seismic report (if applicable), including SEL/SUL calculations, (iv) an MAI/FIRREA appraisal, (v) title insurance and survey with such endorsements as Lender shall request (including UCC insurance and a mezzanine endorsement if any portion of the Loan is a mezzanine loan), (vi) zoning report, (vii) detailed market study, and (viii) other reports or inspections that Lender may reasonably require. |
| Closing Conditions: | The closing of the Loan shall be conditioned upon satisfaction (or valid waiver) of the conditions precedent usual and customary for transactions of this type, including, without limitation, the conditions set forth in Exhibit B attached hereto. |
| Deposit: | Upon Borrower's submission of this executed Loan Application Borrower shall deposit with Lender a processing deposit in the amount of $90    ,000 which amount shall, among other things, be used to pay for third party costs including but not limited to appraisals, environmental reviews, engineering property condition/construction reviews, insurance reviews and legal fees, Borrower and Guarantor shall remain jointly and severally liable to Lender to the extent expenses exceed the amount of such deposit). If at any point Lender determines that such deposit is insufficient to pay estimated Loan processing costs, Borrower shall deposit additional funds with Lender to cover such costs. If the Loan is not approved the Deposit will be returned, without interest, less any costs and expenses incurred by Lender, unless the failure to approve the loan is due to material misrepresentation(s) of the Borrower. |
| Application Fee: | Upon Borrower's submission of this executed Loan Application Borrower shall deposit with Lender a non-refundable Application Fee in the amount of $90,000.  Borrower agrees that the Application Fee shall be earned by Lender upon delivery of the Application Fee.  Borrower agrees that an additional $10,000 application is due and payable at closing. |
| Brokers'/Finders Fees: | Borrower represents and warrants that it has not dealt with any finder or broker in connection with this Loan Application other than Whitestone Realty Capital LLC and  Mattics Lending LLC , who is acting on its behalf in connection with this Loan Application and the related loan.  The Borrower shall pay any and all commissions and fees and Borrower and |

| | |
|---|---|
| | Guarantor each hereby agrees to jointly and severally indemnify and hold Lender harmless from any and all claims for commissions or fees. |
| Title Insurance: | Lender shall order and obtain at Borrower's cost an ALTA lender's and mortgagee's title insurance policy in form and substance satisfactory to Lender, such policy to be issued by a title insurance company selected by Lender with a liability limit equal to the amount of the Loan. As a condition to closing, Lender shall receive at Borrower's expense, a title insurance policy with a liability limit not less than the final loan amount for the Properties, insuring the mortgage securing the Loan as a first lien on the title to the Properties and issued in such form, and by such title insurance company, as shall be satisfactory to Lender. The title insurance policy shall be subject only to such exceptions as shall be approved by Lender and shall contain such endorsements as may be required by Lender or its counsel. Unless otherwise consented to by Lender, such title policy must be issued by Cathy Quinn, Account Manager, Commonwealth Land Title Insurance Company, 685 Third Avenue, 20th Floor, New York, NY 10017, 212-973-4808, cquinn@cltic.com. |
| Acceptance: | If a fully executed copy of this Loan Application is not received by Lender by **within three (3) business days** of the date hereof, this Loan Application shall be null and void. |
| Confidentiality: | This Loan Application is Confidential as are materials shared by Lender and/or Borrower, with the only exception being that Lender and/or Borrower may share Confidential Information with third party consultants. |
| Exclusivity/Break-Up Fee: | The Borrower and Guarantor(s) agree and acknowledge that Lender is devoting resources to the underwriting and analysis of this Loan at the exclusion of other business opportunities and that financing opportunities are limited and extremely competitive. Accordingly, upon the execution of this Loan Application, the Borrower and Guarantor(s) agrees to cease all discussions with any other financing sources and to work solely with Lender to procure the Loan for the Property and agrees not to, and will cause its principals, representatives, agents and affiliates to not, obtain or attempt to arrange a financing for the Property with any party other than Lender. In the event the Sponsor or Borrower or any of their respective affiliates obtain debt financing for the Property from any source other than Lender, the parties hereto agree that Lender shall be deemed to have earned a break-up fee, and shall be entitled to be paid the same, in the amount of one percent (1.0%) of the Loan Amount (the "Break-Up Fee") which Break-Up Fee constitutes liquidated damages and are a reasonable estimate of the Lender's damages. If at any time during the Exclusivity Period Lender notifies Borrower that it does not want to proceed with the Loan, the balance of the Deposit shall be returned, and no Break-Up fee shall be due unless the failure to approve the loan is due to material misrepresentation(s) of the Borrower. Borrower and Guarantor shall be jointly and severally liable for the payment of any Break-Up Fee. |
| Announcement(s) | Upon the closing of the Loan, Lender can publish an announcement. Announcement may include, among other things, identifying the Property, loan amount, and the date of the closing. |
| Closing Time and Procedures: | The closing of this Loan is expected to occur within 45 days from the time the Loan Application is accepted, and Borrower completes the CMC |

|  |  |
|---|---|
|  | Mortgage Loan Submission Package. This loan will be closed in escrow, subject to funding as described in the Loan closing documents. |
| Expiration and Termination: | Under no circumstances unless agreed to in writing by both parties, shall the loan application extend beyond 75 business days from the date of the issuance of a final Certificate of Occupancy (the "Exclusivity Period"). If the Loan has been declined by Lender's Credit Committee in its sole discretion, Lender shall notify Borrower and the Loan Application shall automatically terminate and all costs and expenses incurred by Lender including legal fees shall be paid by the Applicant, but no Break-Up Fee shall be owed to Lender and no additional application fee. If the Loan is approved by Lender's Credit Committee and those terms are materially similar to those set forth herein and such terms are unacceptable to the Borrower, Borrower shall notify Lender and the Loan Application shall terminate and all costs and expenses incurred by Lender including any unpaid Application Fee, legal fees shall be paid by the Applicant, and the Break-Up Fee shall be payable to Lender. Any fees and deposits received by Lender can be used to offset the expenses and costs in connection with the processing of the Loan Application. The terms of this paragraph shall survive the Loan Application regardless of the date of termination of same. |
| Governing Law and Jurisdiction: | THIS APPLICATION SHALL BE GIVEN EFFECT AND CONSTRUED UNDER THE LAWS OF EITHERTHE STATE OF NEW YORK, (WITHOUT REGARD TO CONFLICTS OF LAWS), AND ANY ACTION OR PROCEEDING OF ANY KIND RELATING TO, ARISING OUT OF OR CONCERNING THIS APPLICATION, SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK OR IN A UNITED STATES DISTRICT COURT LOCATED IN THE STATE OF NEW YORK. APPLICANT/BORROWER/GUARANTOR AND LENDER IRREVOCABLY CONSENT TO PERSONAL JURISDICTION AND VENUE OF THE COURTS OF THE STATE OF NEW YORK AND/OR ANY UNITED STATES DISTRICT COURT LOCATED IN THE STATE OF NEW YORK WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES THE RIGHT TO A JURY TRIAL WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING.<br><br>[Intentionally left blank] |
| Authorization: | Borrower is authorized to bind Sponsor (including any Guarantor) to the terms of this Application including, without limitation, the terms set forth in the sections of this Application entitled "Brokers'/Finders Fees," "Exclusivity/Break-Up Fee," "Expiration and Termination," "Governing Law and Jurisdiction" and "Limitation on Liability". |

**NEITHER THIS LETTER NOR THE ACCEPTANCE BY LENDER OF THE APPLICATION FEE AND THE DEPOSIT SHALL CONSTITUTE, OR BE CONSTRUED TO BE, A BINDING COMMITMENT BY LENDER OR AN UNDERTAKING BY LENDER TO FAVORABLY CONSIDER THE PROPOSED LOAN OR TO ISSUE ANY COMMITMENT. BY COUNTERSIGNING BELOW, BORROWER ACKNOWLEDGES THE FOREGOING, AND THAT (1) THE ABOVE TERMS ARE NOT FINAL OR ALL-INCLUSIVE, (2) IT HAS SIGNED THIS LETTER AND SUBMITTED THE ENCLOSED**

{1436754.1}    601 LEXINGTON AVENUE, 20TH FLOOR, NEW YORK, NEW YORK 10022
MAIN (212) 332-1960

SUMS TO LENDER SOLELY FOR THE PURPOSE OF INDUCING LENDER TO CONDUCT A FURTHER REVIEW OF THE ABOVE PROPOSAL AND SUCH FURTHER INVESTIGATIONS AS LENDER DEEMS NECESSARY FOR THE PURPOSE OF DETERMINING WHETHER THE PROPOSED LOAN MEETS WITH ITS UNDERWRITING CRITERIA, (3) FAILURE TO MEET WITH ANY OF THE CRITERIA ABOVE OR ANY CRITERIA REQUIRED BY LENDER MAY IMPACT LOAN AMOUNT, INTEREST RATE, AND/OR LENDER'S ABILITY TO CLOSE, AND (4) ANY COMMITMENT THAT MAY BE ISSUED BY LENDER WILL INCLUDE LENDER'S STANDARD CLOSING REQUIREMENTS AND CONDITIONS AND MAY CONTAIN SUCH OTHER REQUIREMENTS OR CONDITIONS WHICH MAY RESULT FROM LENDER'S INVESTIGATIONS. IN ADDITION, LENDER MAY CEASE THE PROCESSING OF THIS APPLICATION AND HAVE NO FURTHER OBLIGATION TO THE BORROWER IN THE EVENT OF MATERIAL ADVERSE CHANGE IN THE PROPERTY, PRINCIPALS, AND/OR LENDING MARKETS AS DETERMINED BY LENDER IN ITS SOLE AND ABSOLUTE DISCRETION.

The foregoing Loan Application is hereby agreed to and accepted by the undersigned and must be signed and returned to Lender within three (3) business days of the date of this application and is not deemed acceptable without exhibits B, and C completed and attached hereto.

By: _____

Name: Christopher S Robison
Title: Manager
Date: 2/7/2022

By: _____

Name of Guarantor:

Title:

Date:

By: _____

Name of Guarantor:

Title:

Date:

NO CHANGE (WHETHER INTER-LINEATED COMMENTS WRITTEN ON THE RETURN COPY OF THIS LETTER OR ORAL OR OTHERWISE) TO THE TERMS OF THIS LETTER SHALL BE ACCEPTED OR ENFORCEABLE AGAINST LENDER OR ANY SUCCESSOR AND/OR ASSIGNEE THERETO WITHOUT AN

-2-

EXPRESS WRITTEN ACCEPTANCE BY LENDER TO SUCH CHANGE.  FAILURE BY LENDER TO RESPOND TO ANY SUCH CHANGES SHALL NOT BE DEEMED TO BE ACCEPTANCE BY LENDER.

{1436754.1}       601 LEXINGTON AVENUE, 20TH FLOOR, NEW YORK, NEW YORK 10022
MAIN (212) 332-1960

**EXHIBIT A**

WIRE INSTRUCTIONS

Please remit **$105** **,000** (Deposit and the Application Fee) to:

***WIRE INSTRUCTIONS TO BE PROVIDED SEPARATELY***

**EXHIBIT B**

Conditions to closing of the Loan shall include but are not limited to the following (all of the items to be delivered to be in form and substance satisfactory to Lender):

- Completion of all due diligence with respect to Borrower, Guarantors and their respective subsidiaries and the Property in scope and determination satisfactory to Lender
- Satisfactory review of guarantor financial statements,
- Satisfactory review of property operations and projections and leases in place.
- Monthly cashflow projection
- Budget approved by Lender
- Receipt and approval by Lender (and any third party consultant, selected by lender) of (i) title insurance, (ii) property insurance, including (to the extent applicable) (a) rent loss/business interruption, (b) workers compensation, (c) terrorism, (d) wind, (e) flood, (f) earthquake and (g) liability insurance (h) builders risk, as well as any other insurance deemed necessary by Lender
- Receipt, review and approval by Lender of (a) all permits, entitlements, plan and specs, (b) all material construction contracts, (c) all material project management and development agreements and Approval by Lender of an acceptable general contractor, architect and major contractors and sub-contractors
- Receipt of satisfactory legal opinions, surveys, organizational documents, financial statements, certificates, documents and other instruments as are customary or otherwise appropriate for transactions of this type
- Any reciprocal easement agreements related to the Project, if applicable
- Receipt of evidence that the current and anticipated use of the Property and that all existing and proposed improvements thereto comply with applicable zoning ordinances, permits, regulations and restrictive covenants.
- Evidence that all property, air rights and other assets required for the Project are owned by the Borrower
- Lender's satisfactory review and approval of Loan Documents
- Lender shall have received such other documents, instruments, agreements, or information as reasonably requested by Lender
- Completion of Lender's Mortgage Loan Submission Package.
- Completion of Lender's "Know Your Client" ("KYC") process.
- Lender's approval of form lease.
- Final Certificate of Occupancy
- Review of executed leases

## EXHIBIT C (Sources and Uses)

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Loan Proceeds | $ | 14,000,000 | Existing Debt | $ | 9,400,000 |
| | | | Preferred Equity | $ | 1,500,000 |
| | | | Closing Costs | $ | 140,000 |
| | | | Interest & Op Reserve | TBD | |
| | | | Earnout Reserve | $ | 1,350,000 |
| | | | Broker Fee | $ | 140,000 |
| | | | Cash to Borrower | TBD | |
| Total Sources | $ | 14,000,000 | Total Uses | $ | 14,000,000 |